In the morning is DCFS versus Leeds. For the appellant, help me with your last name. Schoenberg. That's what it looks like too, Schoenberg. And for the athlete, Mr. Wilson. You may proceed. May it please the court. I am Assistant Attorney General Kaitlyn Schoenberg and I represent the appellant, the Illinois Department of Children and Family Services. The General Assembly charged the department with helping to ensure the welfare and protection of minors in this state. Given that, this court and the Illinois Supreme Court have recognized that department employees must provide complete and accurate reporting regarding their job duties. And these courts have emphasized some of the ways that fabricated client records can undermine the department's charge. Here, the department has a written policy prohibiting employees from falsifying client and case records and mandating their discharging of dues. Mr. Leeds intentionally falsified multiple facts and contact notes for two of his assigned foster families. As a result, this case is about the department's ability to execute its duties and to enforce the necessary mandate that department employees who falsify client and case records must be discharged. Let me ask you a question because it's clear that everything that you said up to that last word must, I'm assuming that opposing counsel would need to argue with. However, somebody weighed the pros and the cons and somebody decided that this didn't result in neglect of the clients or their families. That he actually provided good support to the clients and families and that he, other than this falsification, which I think he asserted there was what some things were transposed and cut and paste. That he did pretty much what he was supposed to do. So the commission decided this is a good employee with a good record who's made these mistakes that are more than just a slap on the wrist, but they don't deserve discharge. How do you argue that case? I have several points in response to that question, Your Honor. First, I would just clarify that although during the administrative hearing, Mr. Leeds did assert that some of the information contained in the reports were cut and pasted. The commission ultimately adopted the ALJ's resolution. Yeah, I'm saying that was his defense. I'm not saying that they adopted that. So they agreed to, I mean, they were falsified. Right, and Mr. Leeds has not challenged the commission's finding that he intentionally falsified the facts in those case notes. As to the rest of the question regarding the mitigating evidence that the commission reviewed here, of course the commission is entitled to review mitigating evidence. However, this court still has the ability to review the commission's decision. It is a deferential review. However, it does not mean no review. And the commission's decision can be set aside where it's unreasonable or unrelated to the terms of Mr. Leeds' service as a child welfare specialist. And here the commission's decision was unreasonable. Particularly the part of the commission's decision based its conclusion in part on its conclusion that there was no evidence that the clients at issue were actually exposed to any risk and or detrimental effects due to his mistakes. Now I noted in your argument that you had, if you're in your brief, you said, well, we shouldn't have to wait until there's actually harm. But that's really not the point. The real point is, in this particular instance, there's no evidence whatsoever that these falsifications, which we have to accept as being false, did anything to affect the care or welfare of the children or the families that he was interacting with. And in fact, they all spoke highly of him, and he's got a 16-year exemplary record. So isn't that relevant? The fact that it didn't cause harm would be relevant in determining whether maybe this was inappropriate if, in fact, we had evidence that there had been harm. But merely the fact that there isn't harm doesn't mean that somehow we're saying by approving or agreeing with this, well, we're going to wait until there's harm before we're going to find something else. Well, certainly whether or not there was harm would be relevant to the commission's decision. But this court has before said the fact that there was no harm to a child is insignificant. In the Department of Children – sorry, the Department of Central Management Services v. AFSCME, 1993, this court specifically stated that the fact that no child was hurt was insignificant. And instead, it was the employee's dishonesty on such a significant issue that makes progressive discipline a risk that children of this state need not be. Wasn't that the case where they completely fabricated a report, the facts of the report were untrue, there was no such report? I mean, wasn't that the fact? Yes, in that case, the – So we're talking about a gross lie. I mean, we're talking about somebody who actually created a report out of whole cloth and said that a child said something that they didn't even say. Correct. In that case, the department investigator had stated that she had conducted an investigation that she had not actually done. But here, there was two – in the two case notes that Mr. Leeds falsified, those were regarding incredibly essential parts of his job. In one case, Mr. Leeds falsified the time and location of his meeting with the foster children. How does that become incredibly sensitive? It's an essential – The time and location. It's an essential part of his job because during the administrative hearing, there was testimony explaining the reason behind the requirement that child welfare specialists have monthly visits. Well, sure. I mean, in general. But the question is, what is it about just the time and location that makes this so incredibly sensitive? Well, when child welfare specialists go to the foster homes, they're not only meeting with the foster child, but they're assessing the environment of the foster home. Which he had done for quite some time previously. He had not done it in the month of September. In that month, but he had done it before. True. Over how many months? I believe he had been, for at least one of the cases, he had been the child welfare specialist assigned to that case for a few months. In the CN case, I can't recall the exact length of time in the PHB case. And in no instance was there any indication that there was any dramatic change or difference in the condition of the home and the children that he had seen the month before? I don't believe there was evidence of that in the record. However, things like whether or not there's adequate food or whether the utilities are on, who is in the home, and how the foster child and foster family are interacting are subject to change from day to day or month to month. And that is why the department requires child welfare specialists to meet with the foster children in the foster home once per month to make sure that the child remains in a safe environment. And so Mr. Lee's falsification of that information here in these two cases was an essential part of his job. And because of that, the fact that there was no evidence that any of these particular children in these particular cases was not harmed doesn't mean that the commission's decision was still reasonable. Again, this court has said the fact that no harm befalls a child isn't significant. And in addition, the Illinois Supreme Court in the AFSCME case explained the fact that no harm befalls a particular child should not be the yardstick by which courts are analyzing whether an individual should remain employed by the Department of Children and Family Services. Does that mean it's not a relevant factor to consider? It can be a relevant factor to consider. But again, the overwhelming evidence here means that the commission's decision was unreasonable. Again, its approach of only focusing on whether or not the particular children in these particular cases was harmed was criticized by this court as well as the Illinois Supreme Court and the Department of Central Management Services in the AFSCME case. Moreover, in a similar vein, the commission's decision was unreasonable because its conclusion that there was no evidence that the clients were actually exposed to any risk or had any detrimental effects takes too narrow an understanding of the word risk or detrimental effects. In AFSCME, the Illinois Supreme Court explained in that case there were children who were injured. But the Illinois Supreme Court explained in that case that that case was not just about the children who were injured. That case was also about the children who remain under the Department's protection and depend on child welfare specialists to monitor their cases and to speak for them in court proceedings. And so the concern in falsification cases is not just whether any particular child was harmed, but the court's concern should also lie with other children who will have to rely on those child welfare specialists to speak for them when those child welfare specialists have falsified records. I would also add that the commission's decision was unreasonable and unrelated to the terms of Mr. Lee's service as a child welfare specialist given the testimony during the administrative hearing regarding the Department's rule prohibiting falsified records and lying in case records and the reason behind it. There was testimony explaining that the Department uses the information in the contact notes to generate reports that the Department then submits to circuit court judges during pregnancy proceedings in order to help determine where children should be placed. In order for the Department to provide accurate information to courts during these important proceedings, it's necessary that the underlying information in the case notes also be accurate. I hope this doesn't come as a shock to you, but after 17 years in the trial court, the inaccuracies in DCFS reports are beyond count. They occur regularly because there's so much change in staff, so much turnover, so much cut and paste that you have to learn to read between the lines as opposed to just reading the reports. So the fact that there might be inaccuracies in a report doesn't really come as an earth-shattering surprise. Well, here, these were falsifications regarding visits that hadn't occurred when and where Mr. Lee stated that they did. And there was also testimony during the... Well, in reality, one was at a school and he said it was at the house. That's correct. Right? Right. And again, the... One, he said there were two present. The other, there was actually one present. Correct. And again, these meetings, it's required that the child welfare specialists meet in the foster home with each of the foster children. And stating that he had seen both children in the foster home when, in fact, only one was present was a significant dereliction of his duty. Well, even though when he was invited to come, it was intended that they were going to be there, it's just that one of them had an after-school function that had not been planned. So it wasn't like he purposely went to see one. He thought two were going to be there. One just happened to not be there on that day. And so he was going to follow up with the second one later. Right? That is correct. But he did report that both were there. Absolutely. Yes. And again, visiting both of the foster children in the foster home, the adult to Mr. Lee, the ability to accurately report back to his supervisor how the children are doing in the foster home and how the case should progress. Well, I guess to follow up with Justice Connick's question, the Commission already heard all that. What is it that makes these allegations so unreasonable or unrelated to the requirements of service that we should now reverse their decision? Again, it's in light of the holdings from this Court and the Illinois Supreme Court requiring complete and accurate reporting when it comes to their job duties. His job duty here was to meet with the foster children in the foster home. So everyone that is in action in court is subject to – should be discharged. Period. The department's rule is that if there is any falsification regarding a client or case record, then the department will immediately begin to start proceedings for that employee. And again, Mr. Lee – It just so happens that they really don't have the ultimate say in that. True. Their decision is reviewable by the Commission should the employee challenge it. So what they're saying is if you falsify records, this is what we're going to pursue. Correct. But that doesn't necessarily mean that's going to happen. True. Yes. Because the employee can challenge the department's decision and the Civil Service Commission. So what's wrong with having that policy as a club to hold over employees' heads and the fact that, okay, the Commission took that all into consideration and decided, well, in this case, discharge isn't necessary. Why are those incompatible? Because you're – if I'm understanding your argument and the way I read it in the brief, because you have this policy, we're obligated to follow through with discharge. No. The point that I was trying to make in the brief regarding the department's policy requiring discharge is simply that in other Civil Service Commission cases, this Court and other courts have looked to whether or not the department or agency has a rule requiring or letting the employee know, essentially, that certain conduct will necessarily result in discharge. And where the rule has stated up to and including discharge until it's not clear to the employee that particular conduct will result in discharge, courts have found that to be a reason to potentially impose suspension rather than discharge. But here, Mr. Leeds knew that falsifying records would require that he would be discharged under the department policy. Nobody's claiming due process argument that they weren't given notice and they didn't have the right to realize that they were possibly proceeding with a discharge. Right. That's correct. There is no due process argument here. But it just adds to the evidence that this Court should consider to reverse the Commission's decision because of the well-established rule that the department had requiring discharge where there are falsified records requiring case information. And to go back to the question that you had asked originally about what is it about the Commission's decision that's so unreasonable that it should be overturned by this Court, and that it is based on this Court's ruling and Department of Central Management Services and the only Supreme Court's decision in AFSCME, which require complete and accurate reporting from department employees. And those cases specify the ways in which inaccurate, incomplete reporting undermines the department's ability to meet its duties as the Federal Assembly has charged it with protecting foster children in this state. And so given this Court and the only Supreme Court's decision, the Commission's decision was unreasonable because in part, as I explained, it only looked at whether or not particular harm was occurred or there was a particular risk to these particular children in this case. But the analysis is a bit broader than that. Again, in AFSCME, the only Supreme Court explains that it's not just about the children harmed in that case, it's about the children who remain under the department's protection and will have to rely on a caseworker who intentionally falsified case contact notes. And because of that, and the rule holding that this Court, as well as the only Supreme Court, this Court should reverse the Commission's decision as unreasonable. Counsel? Go ahead, Judge. Did he receive pay during the suspension? Or is it without, you suspended without pay? I'm not sure whether that evidence was presented in the record, but I can check. Well, what I'm thinking of is that I think maybe the Commission did take into account the general duty of the department to provide for the care and welfare of all the children under its auspices by taking into account that he had 16 years of service with an exemplary record. So that shifts the focus from, yes, there's no harm to these children, but that can't be the only standard, or that's not the only part of the yardstick. Another part of the yardstick is, is this repeat behavior, or is this indicative of a greater flaw than had previously been seen, that his work was always, you know, a little bit sketchy. So, particularly if it was without pay, that's a hell of a hit. I mean, that suspension, it isn't like, well, you can falsify records and nothing's going to happen. It's going to be on your permanent record. It may affect his further job advancement within the department, and he may have lost a significant amount of pay in a state job where pay is not six figures. That doesn't sound like the Commission was ignoring the duty of the department or his duty as a child welfare specialist. Again, certainly the Commission is entitled to weigh and review that mitigating evidence, such as his length of service and whether he had any prior disciplinary issues. But again, in light of court holdings requiring nothing short of complete and accurate reporting when it comes to child welfare specialist interaction with children and their reporting on what they saw and what they've done, the Commission's decision was unreasonable. So, I think your position is, because of precedent, whether we phrased it as our hands are tied, or if we want to be consistent with precedent, we have to reverse. That's correct. And in addition, based on all of the evidence and testimony presented during the administrative hearing, it showed the very important reasons behind requiring complete and accurate reporting from child welfare specialists. I doubt if your opposing counsel would even argue with that. That, yeah, it's extremely important, and it deserves a sanction if it's not done. Right. Well, and again, as your Honor just stated, in light of this Court and the Illinois Supreme Court's mandate that department employees provide complete and accurate representations and recordings of their visits with children and what they have done during their job duties, I'm sorry, I ceded my time. I interrupted Justice Turner, or he conceded to me, and you both started to speak at the same time. Do you have an additional question? Well, she's out of time. I'll ask her my question on rebuttal, unless I forget about it. Thank you. Thank you. You will have rebuttal. Why aren't we bound by what appears to be precedent for these kinds of cases? Good morning. My name is Brad Wilson. I work for the district. Your Honor, those cases are factually distinguishable. Each of the cases, both the AFSCME case and then the Fourth District case cited by the department, arose as a result of a petition to vacate an arbitration board. As a result, there was a different standard of review that was applicable to those cases than the standard of review that the Court must adhere to in this case. And the standard of review in this case grants the Commission's decision great defense. And the Courts have long noted, even if they were to feel that another sanction was more appropriate, the Commission's decision should nonetheless stand, unless it was arbitrary, unreasonable, or unrelated to the terms of service. How is that different from the standard of review previously used? The standard of review? You said the standard of review here is different than those cases that Justice Connected referred to. In those cases, the petition to vacate arbitration boards, again, it is a limited standard of review. An arbitrator's award should only be overturned, for example, if the Court finds that the arbitrator, if there is fraud present, illegality, if the arbitrator acted outside the scope of his authority. And then what they're touching on in the AFSCME case and the other, the Fourth District case, the Courts have later recognized that there is a public policy exception that it can apply if it feels that the arbitrator, because essentially the arbitrator is charged with enforcement of contract. And if the arbitrator's interpretation in enforcement of contract is contrary to public policy, then even if none of those other factors are present, fraud, illegality, etc., the Court can't overturn that decision. In this case, it appears that the Department of Privacy dovetailed with that by noting that the Commission's rules regarding the definition of cause for discharge state that, define cause for discharge as a substantial shortcoming that in some way renders the employee's continuance in the position detrimental to the discipline and efficiency of the service, and that law and sound public opinion recognizes good cause for the employee's removal from the position. And then it segues into the arguments based on AFSCME and the decision by the Spelman Supreme Court, the Fourth District's decision, where they talk about public policy as a matter of semantics. Perhaps I would say there is a difference between sound public opinion and public policy. Well, Counsel, I'm going to go into the question I was going to ask of your opposing counsel. Am I correct that the question for this Court of Review is whether the Commission substantiates its decision? Isn't that what we're supposed to be doing here? That's our position, Your Honor. The most recent case, and the only case cited by either party that is directly on point, in other words, it arose as a result of a decision rendered by the Illinois Civil Service Commission, is the Department of Juvenile Justice case. And in discussing the standard of review, this Court noted that it's a two-step process, and we look at the manifest way of the evidence. And then the second step is whether or not the decision regarding discipline is arbitrary and reasonable. And in that case, in which the Commission didn't, like this case, deviate from the recommended decision of its ALJ, the second step focuses on whether the Court substantiated its decision. And in this case, a substantiated decision is one in which the Commission explains its rationale for deviating from the recommendation. And without a doubt, in this case, the Commission's decision gives explicit reasons as to why it deviated from the ALJ's recommendation. And those reasons, as I understand, would be the nature of the offense, the performance record, the history of discipline, and the length of the continuous service. So those would be the factors cited to explain why the decision was different than that of the ALJ's. Am I correct? Yes, Your Honor. And I would note that those are factors that the Commission, well, first, the Commission is a statutory creature. It's created by statute. It's also obligated to follow its own rules. And when looking at the appropriate level of discipline, the Commission's rules require the Commission to look at those very factors you listed, plus it also requires the Commission to look at other relevant factors. Okay. I don't have a further question on that, but I just would note that I'm sure opposing counsel heard those questions. I hope you respond in due course when you have your rebuttal. Thank you.  And to continue on that same vein, Your Honors, in considering each of those factors, for example, in considering the nature of Leeds' offense, the Commission, without a doubt, noted that Leeds made a serious mistake in violation of DCF rules, and the Commission did find that he intentionally misrepresented the location of the contacts. But it appears that the Department is asserting that that should be the end of the analysis. The Department's position appears to be that we have this rule, and because we promulgate this rule, the Commission and any review in court is obligated to follow that rule. We disagree with that, and the Commission did. And as a result, the Commission also looked at Leeds' performance record and prior disciplinary history, and it found that Leeds always received performance evaluations that met or exceeded his supervisor's expectations. It noted he was a long-term enthusiastic employee who genuinely cared about the clients he served, and put significant effort into not only helping his own clients. He would stay late. He would work weekends. He would help out his co-workers complete their tasks. Concerning the length of service, it's understood Mr. Leeds has noted that the court's question was the 16-year employee, which, as someone who's represented, that is, in our opinion, significant, given the fact that he had no prior discipline in 16 years. There's no evidence of him being even a single writer. Now, they noted the Commission's rules also required it to look at other relevant factors, and in doing so, the Commission noted that DCFS clients specifically testified that Leeds was a good employee on their behalf. They testified that his conduct was in no way detrimental to their families. In fact, I believe it was the foster mother in the PGB case who said that Mr. Leeds was the best. The best caseworker they had. She liked him better than the others. And then, even though Mr. Leeds did misrepresent the location of his contacts with the clients, he did have substantial, consistent contacts during the relevant time frame. For example, in the CN case, it's understood that Mr. Leeds met with the children in school, at their school, and there was testimony that he asked the foster mother, do you want to go back to the house to meet there? And she said, no, can we just do it here? So he did. The department notes that, well, the caseworker is supposed to go into the house to make sure that it's safe. And that's the reason why it's so important that he go in there. Well, Mr. Leeds went to the house on a weekly basis to pick the children up, because he would take them to court-ordered visits with their biological parents and women. Similarly, in the PGB case, Mr. Leeds went to the foster home, and that was the foster mother, and it was under the assumption that both foster children would be in the house, but Q, one of the foster children, was, and he ended school. So Mr. Leeds had the opportunity to view the house, make sure that it was sanitary, make sure that there was adequate food, make sure that the children had their own space, and that they were clothed in blankets. And he did go and then meet with Q at school. And presenting this, I'm not trying to diminish the importance of the department's mission, but I think that those factors are relevant, and they were considered by the commission, and that helps explain why the commission considered the discharge was not appropriate. Rather, a suspension of 103 days was appropriate, and that suspension was without pay. You can look at the commission's rules and statutes, talk about what happens when an employee is discharged or suspended. If they are reinstated, then they get their back pay. And that's what happens. If Mr. Leeds was off work for 103 days without pay and continues to remain off work, the department is without pay at this point. So that was a significant penalty that was imposed by the department, and the commission, considering all the factors that it was required to consider, found that penalty was sufficient to protect the department's interests, including its interest to make sure its employees were aware that falsification of case notes would not be tolerated. The department relies heavily on the Ashton case rendered by the M.R. Supreme Court, and by the Fourth District's decision in the Department of Central Management Services. And counsel is correct in both those cases. The courts acknowledge this public policy. The state has a strong public policy that favors the protection of abused and neglected children. However, those cases are distinguishable, again, on its facts, circling back to the original question. I talked about the fact that the standard of review is different. But also, the conduct of the employees in each of those cases was so much more egregious than Mr. Leeds' conduct. It's not surprising that the courts took the step of applying the public policy exception to vacate the arbitration awards rendered in both those cases. As discussed in the Department of Central Management Services case, yes, the employee did wholly fabricate a report about an interview which purportedly took place, but in fact never did. And what makes that even more egregious in that case, the employee used that fabricated report to support her conclusion or recommendation that a case of potential abuse be non-indicated, which means that no further action is going to be taken. Obviously, fabricating something for the purpose of or stalling an investigation of abuse does undermine the state public policy or strong interest in protecting abused and neglected children. In the AFSCME case, the conduct was equally egregious as in the Department of Central Management Services case. The employee fabricated a report about her contact with children, with her clients, which never took place, that those children had already been deceased. And also, the court noted that Mr. Boies, the employee in that case, had neglected her case for three years. That's a wholly different animal than the situation here. Mr. Leeds was a dedicated employee, had consistent, continuous contacts, and provided good and valuable service to his clients. Also, in the AFSCME case, the Illinois Supreme Court vacated the arbitrator's decision, in part because the arbitrator took no precautionary steps to make sure that the employee's conduct was not repeated. In this case, the commission took those steps. 103 days suspension without pay. It's our opinion that this situation is more like two cases we cite. One is the State of Illinois Department of Mental Health case. In that case, two State Department of Mental Health employees left the facility without authorization during their absence. An employee died. The department discharged the employee, finding that they were guilty of abuse of a service recipient. The union took the matter to arbitration, and the employees were reinstated. And in that case, the Illinois Supreme Court affirmed the arbitrator's decision, even though it recognized that the state has a strong public policy in favor of protecting the mentally disabled. In fact, that case was cited by the AFSCME court a few years later. And as it was sent, I believe, one of the justices noted, our policy of protecting the mentally disabled is just as strong as our public policy in favor of protecting abused and neglected children. But nonetheless, in the Department of Mental Health case, the Illinois Supreme Court allowed those two employees to go back to work, in part because the records show that other than this one incident, those were two exemplary employees, just like Mr. Leeds. Now, in the Council 31 AFL-CIO case, and that's the third district case that we cited, the DCFS protective investigator failed to initiate investigations. So in our assertion, that's even worse. I mean, not only did Mr. Leeds make a fabricated report, but at least he was attending to his clients. In the Council 31 case, the investigator wasn't even going out to visit alleged victims of abuse or other subjects of investigations. Certainly, that would undermine the state's public policy to protect abused and neglected children. That person was fired. His union filed a grievance. The arbitrator ordered his reinstatement. The trial court in that case overturned the arbitrator's decision, finding that it violated public policy. But the third district disagreed and affirmed the arbitration, ordering the employee's reinstatement because of the evidence that showed that that employee's work history and performance record showed he was amenable to corrective action. He would not engage in behavior again. And that's similar to Mr. Leeds. Sixteen years of excellent service. Clients who spoke highly of him. Supervisors who, up until this incident, thought highly of him. It's our opinion that the Department of Mental Health in the Council 31 case demonstrates that a public policy does not always warrant discharge. In both those cases, other factors, such as the work history and performance record mitigated and the level of discipline that was imposed, were found to be a sufficient level of discipline so that the state's interests were protected. Simply put, we think that the Commission considered all the factors it was supposed to consider. It went through the step-by-step process, just like it was supposed to. It followed the process and came to the conclusion, I'll be a woman if the Department of Mental Health disagrees with me, but one that should not be found to be arbitrary and unreasonable in relation to terms of service. For these reasons, we would ask that the Commission's decision be affirmed. And if there are any further questions, I'm happy to answer them. I see none. Thank you. Thank you. Rebel? Rebel? I'll begin by answering, Justice Turner, your question about the standard of review again. Certainly, a decision where the Commission failed to substantiate its decision, why it departed from the ALJ's recommended decision, may be a situation in which a court may determine that the Commission's decision was arbitrary or unreasonable. But it is not the only reason that a court may reverse the Commission's decision. All that the court needs to look at is, in the Illinois Department of Juvenile Justice case, the court stated that the discharge determination is subject to judicial review and will not be reversed unless arbitrary, unreasonable, or unrelated to the terms of service. And so this court may still review a Commission's decision, even if it substantiates its decision, to determine whether or not the Commission correctly decided that cause for discharge did or did not exist. Moving on to argument regarding cause for discharge and our reliance on AFSCME and Department of Central Management Services. Yes, those cases were about arbitrations and setting aside an arbitration award. But cause for discharge exists where law and public policy would recognize good cause for removal. In AFSCME and in Department of Central Management Services, this court and the Illinois Supreme Court extensively analyzed all of the statutes that have been enacted by the General Assembly, charging the Department with various responsibilities regarding safety and protection of children and determined that there is a policy in this state of protecting children and preventing harm to them. So that analysis regarding public policy can still be borrowed to analyze this case before the Civil Service Commission to determine whether law and public opinion would find good cause for removal in this case. My opposing counsel argued that the conduct in AFSCME and the Department of Central Management Services was more severe than the conduct at issue here. I would note, however, that there was testimony during the administrative hearing about the importance of accurate case notes because cases are transferred from one caseworker to the next and a new caseworker must be able to rely on the accuracy of the case notes made by the prior caseworker. And here, at the time that Mr. Leeds created the contact notes in these cases, he knew that he would be leaving his position as a child welfare specialist to join the Department's adoptions unit. So he knew that someone else was going to be relying on those notes, and yet he included false information. And lastly, I would just point out that the cases cited by Mr. Leeds, the Council 31 case as well as the Department of Mental Health case, again, first of all, the analysis used in those cases were in the arbitration awards, so questions as far as nexus of harm and ability to rehabilitate the employee are not necessarily applicable in the Civil Service context. But aside from that, the facts of those cases are distinguishable. I don't believe in either case there were any allegations that the employee had falsified any records, and particularly not records that are so essential to their job duties, as happened here in this case. If the Court has no further questions... We do not. Thank you. I ask that this Court reverse the disciplinary decision of the petition. Thank you. Take it under advisory.